**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| ELIZABETH MCKENNA,<br><br>Plaintiff,<br><br>v.<br><br>RUSH UNIVERSITY SYSTEM FOR HEALTH; RUSH UNIVERSITY MEDICAL CENTER; and KIRK MCKENNA,<br><br>Defendants. | ) | Case No. 1:26-cv-11675<br><br>**JURY DEMAND** |

# <u>COMPLAINT</u>

Plaintiff Elizabeth McKenna, for her complaint against defendants Rush University System for Health, Rush University Medical Center (collectively, "<u>Rush</u>") and Kirk McKenna, hereby states as follows:

## <u>Nature of Action</u>

1. This is an action for monetary damages stemming from Rush's unauthorized disclosure of Plaintiff's sensitive, devastating, confidential medical records and protected health information to an individual who was not permitted to receive it: Plaintiff's ex-husband. The severity of the consequences Plaintiff has suffered because of Rush's unauthorized disclosure cannot be overstated. Since obtaining Plaintiff's medical records, Plaintiff's ex-husband has been falsely claiming to numerous members of Plaintiff's community and social circle that Plaintiff killed her unborn child, which has put a black mark on Plaintiff's reputation that no amount of monetary damages can undo.

## <u>Parties</u>

2. Plaintiff Elizabeth McKenna, an individual, is a citizen of the State of Illinois and resides in Kendall County, Illinois.

3. Defendant Rush University System for Health is an Illinois not-for-profit corporation with its principal place of business located in Cook County, Illinois. Rush University System for Health and Rush University Medical Center operate as a system of hospitals and medical facilities for patients to receive medical diagnoses and treatment.

4. Defendant Rush University Medical Center is an Illinois not-for-profit corporation with its principal place of business located in Cook County, Illinois. Rush University System for Health and Rush University Medical Center operate as a system of hospitals and medical facilities for patients to receive medical diagnoses and treatment.

5. Defendant Kirk McKenna, an individual, is a citizen of the State of Illinois and resides in Kendall County, Illinois.

## Jurisdiction and Venue

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510 *et seq*.

7. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims at issue in this matter occurred in this District.

## Allegations Common to All Counts

### *A. Plaintiff's Hospitalization at Rush*

9. Plaintiff is a 36-year-old mother of two children.

10. On September 22, 2025, while pregnant with her third child, Plaintiff was found unconscious in her home by her adult niece. None of Plaintiff's children were home at the time Plaintiff was found. Neither Plaintiff nor her niece knew how long Plaintiff had been unconscious, and Plaintiff was hypothermic with a dangerously low heartrate at the time she was found. Plaintiff's niece called an ambulance, and Plaintiff was rushed to Rush University Medical Center at 2000 Ogden Avenue, Aurora, Illinois.

11. Approximately six months before Plaintiff was hospitalized, she had gone through an acrimonious divorce with her ex-husband, Defendant Kirk McKenna, with whom she shared her two children. After the divorce, McKenna was not authorized to receive any information about Plaintiff's healthcare or medical treatment, including any treatment Plaintiff received at Rush.

12. After being admitted to Rush, Plaintiff was examined by numerous physicians, who frantically tried to determine the cause of Plaintiff's lack of consciousness. The physicians performed a number of blood, urine and other tests, all in an effort to help Plaintiff regain consciousness.

13. When she was admitted, physicians at Rush determined that Plaintiff was approximately 30 weeks pregnant. The physicians also determined, within minutes of Plaintiff's arrival, that Plaintiff's unborn child did not have a heartbeat or any signs of life.

14. In total, Plaintiff spent approximately six days at Rush. During that time, numerous tests were performed to help physicians understand the cause of Plaintiff's lack of consciousness. Among other things, Plaintiff's medical notes reflect that Plaintiff had [redacted] and had a high-risk pregnancy due to her age. Treating physicians at Rush also determined that Plaintiff had preeclampsia, which had not been previously diagnosed, as well as [redacted]

15. During her stay, Rush physicians also determined Plaintiff had [redacted] at the time she was found unconscious.

16. After awaking in the hospital, Plaintiff was confronted with the devastating news that she had lost her unborn daughter.

17. Plaintiff's treating physician at Rush identified several contributing factors to the loss of Plaintiffs' daughter. These included preeclampsia/seizures; an aspiration event; head trauma; and pulmonary embolism. Plaintiff's physician further diagnosed Plaintiff with preeclampsia, antepartum; [redacted].

18. In addition to these diagnoses, blood tests performed on Plaintiff during the time of her hospitalization revealed that Plaintiff had trace amounts of cocaine in her system at the time she was found. Plaintiff had a history of anxiety and depression, and during the week leading up to her hospitalization, she had been struggling with her mental health. She was also spending an increasing amount of time alone because her partner was away for work for weeks at a time, which contributed to her depression. The weekend Plaintiff was hospitalized, she had been alone up until the time her adult niece discovered her unconscious.

19. The only individuals authorized to receive information about Plaintiff's care at Rush were Plaintiff's sisters. Plaintiff completed written authorization forms permitting Rush to share information about Plaintiff's care directly with Plaintiff's sisters over the phone and in-person, when they came to visit. Plaintiff did not authorize any other individual to receive information about Plaintiff's hospitalization or treatment.

20. In fact, at one point, Plaintiff's sisters expressly instructed Rush staff to not permit McKenna to visit Plaintiff while she was in the hospital or to grant him access to her hospitalization

records. Plaintiff and McKenna had a tumultuous relationship in light of their divorce, and at one point, Plaintiff had even obtained an order of protection against McKenna. Plaintiff therefore did not want McKenna or any member of his family or social circle to have access to Plaintiff's medical records, especially in light of the sensitivity of the circumstances surrounding Plaintiff's hospitalization at Rush.

21. Despite Plaintiff's refusal to authorize McKenna or anybody other than her sisters to receive information about her treatment at Rush, numerous individuals called Rush attempting to obtain information about Plaintiff and her care. Plaintiff's Rush medical notes reflect that at one point, an individual called and identified herself as "Deena" and said she was Plaintiff's sister. Plaintiff does not have a sister named Deena.

22. Rush had been receiving so many calls inquiring about Plaintiff's hospitalization that Plaintiff's sisters instructed Rush to anonymize Plaintiff's admission and require any person seeking access to Plaintiff's medical information to be required to first provide a five-digit code.

23. Upon information and belief, at least some of the individuals attempting to access Plaintiff's medical record were McKenna's family members, and possibly McKenna himself.

### ***B. Plaintiff's Ex-Husband Obtains Plaintiff's Protected Health Information***

24. After being discharged from Rush, and while mourning the loss of her unborn daughter, Plaintiff began hearing from her neighbors and members of her community that McKenna had been telling them that Plaintiff had killed her unborn child by using cocaine while pregnant.

25. McKenna did not limit his false, damaging statements to Plaintiff's neighbors. At one point, the contractor Plaintiff had hired to perform renovations on her home revealed that he, too, had heard similar statements directly from McKenna.

26. McKenna's statements to a yet-unknown number of people about Plaintiff are false and were false at the time they were made. Plaintiff's treatment team at Rush had not concluded that cocaine had caused the loss of Plaintiff's unborn child. Rather, the team had determined that the loss was the result of a variety of factors, including previously undiagnosed preeclampsia.

27. Even though they were false, the rumors were devastating. Plaintiff was inundated with feelings of shame, guilt, embarrassment and humiliation by being labeled and perceived as a "baby killer" by members of her community.

28. Plaintiff was also confused and angry. She did not understand how McKenna had any knowledge about not only the loss of her daughter, but also the results of her blood test. Neither Plaintiff nor her sisters told McKenna this information. McKenna had not been authorized to receive any of this information from Rush. Nor had any of his family members, friends or individuals with whom he associated.

29. But somehow, McKenna came to know of Plaintiff's Rush medical records and began broadcasting it to McKenna's community. Plaintiff was subjected to public condemnation, immense shame, sadness and grief. That was only the beginning for Plaintiff after she was discharged from Rush.

30. Approximately one week after she was discharged, a case worker from the Illinois Department of Children and Family Services ("DCFS") visited Plaintiff's home and claimed that a "drug-induced seizure" had caused the death of Plaintiff's unborn daughter. Plaintiff did not know how a DCFS case worker became aware of the loss of Plaintiff's daughter, or why the case worker was claiming that the loss was the result of a "drug-induced seizure" instead of the undiagnosed pre-eclampsia and other factors Rush's physicians had identified as the cause of the loss.

31. Before her hospitalization, Plaintiff's only interactions with DCFS had been when McKenna made four or five unfounded reports against her after Plaintiff divorced him and moved in with a new boyfriend. Of those four or five reports, DCFS made only one indication against Plaintiff, which was for allegedly failing to adequately supervise her then-14-year-old daughter by letting her stay home alone overnight.

32. But after confronting Plaintiff in September 2025 about the loss of her daughter, DCFS limited Plaintiff's access to her other children and opened an investigation. Shortly thereafter, the State's Attorney indicted Plaintiff, claiming that because Plaintiff had cocaine in her system when she was found unconscious at her home by her adult niece, it was "likely" that Plaintiff had "used cocaine while in a caregiving role" and that she "created an injurious environment for her children." The State's Attorney made this allegation despite the fact that none of Plaintiff's children were at Plaintiff's home when she was found unconscious.

33. As a direct result of the DCFS investigation and petition, Plaintiff's access to her children was limited between September 2025 and May 2026. During this time, Plaintiff's relationship with her oldest child severely deteriorated because of the DCFS investigation and widespread, false rumors that Plaintiff had killed her unborn daughter.

34. Throughout the duration of the DCFS case, Plaintiff was randomly drug tested by DCFS for six months and, at a certain point, was required to wear a drug patch. Plaintiff was required to enter outpatient drug therapy. Plaintiff was prohibited from having any contact with her kids and could not even access their academic records. Worst of all, the State's Attorney prosecuting the case explicitly called Plaintiff a "baby killer."

35. In short, the fallout from Rush's unauthorized disclosure of Plaintiff's medical records was swift, widespread, and completely devastating. Plaintiff's life, relationships,

reputation and standing in her community have been irreversibly damaged. Plaintiff's mental and emotional health have also severely declined as a direct result of being publicly and privately labeled a baby killer and unfit mother.

### *C. Rush Admits Unauthorized Disclosure of Plaintiff's Protected Health Information*

36. Rush is a provider of medical or other health services. As such, it constitutes a healthcare provider and "HIPAA-covered" entity within the meaning of 42 U.S.C. § 1320d.

37. The medical record Rush prepared and stored pertaining to Plaintiff; her past, present and future physical or mental health condition; the provision of healthcare services to her; and Plaintiff's identity qualifies as "individually identifiable health information" and "protected health information" within the meaning of 45 C.F.R. § 160.103 (collectively, the "Protected Health Information"). Specifically, Plaintiff's Protected Health Information includes the entirety of her Rush medical record, including notes, diagnoses, comments and analyses pertaining to her hospitalization, the loss of her unborn child, and the presence of cocaine in her blood.

38. The U.S. Department of Health and Human Services, pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), has established standards for the privacy of individually identifiable health information and "protected health information" that governs how health care providers like Rush safeguard and protect private health information.

39. Under the HIPAA privacy rule, 45 C.F.R. §§ 160, 164, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

40. Additionally, 45 C.F.R. § 160.404 outlines the procedures a HIPAA-covered entity must follow in the event of a breach of a patient's Protected Health Information. Specific, HIPAA-covered entities are required to notify patients within 60 days of any discovery of a breach. The

date of discovery is considered the date on which the breach is known to the covered entity, or the date that "by exercising reasonable diligence would have been known to the covered entity."

41. The C.F.R. further provides that the notification of a breach must contain a "brief description of what happened," including the "date of the discovery of the breach, if known."

42. The Illinois Medical Patient Rights Act ("MPRA"), 410 ILCS 50 *et seq.*, similarly prohibits a physician, health care provider, health services corporation and insurance company from making any unauthorized disclosure of a patient's medical records. Rush is a "health care provider" within the meaning of the MPRA.

43. The Illinois Personal Information Protection Act ("IPIPA"), 815 ILCS 530 *et seq.*, requires that a "data collector" that "owns or licenses, or maintains or stores . . . records that contain personal information concerning an Illinois resident" to "implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure." Rush is a "data collector" within the meaning of IPIPA.

44. The Illinois Hospital Licensing Act ("HLA"), 210 ILCS 85/6.17, provides that every hospital licensed under the HLA "shall develop a medical record for each of its patients" and that no member of "a hospital's medical staff and no agent or employee of a hospital shall disclose the nature of services provided to patients, except that the information may be disclosed to the patient, persons authorized by the patient, the party making treatment decisions . . . or where otherwise authorized or required by law."

45. Plaintiff's Rush medical record and Protected Health Information is part of an electronic record stored within a computer software system or on a Rush server. The record is accessed, updated, viewed and distributed electronically.

46. At all relevant times, Rush owed Plaintiff a duty of care as a patient at Rush's medical facility. This duty required Rush to protect Plaintiff from reasonably foreseeable harms, including the reasonably foreseeable harm that a Rush employee may access Plaintiff's medical record for inappropriate or tortious purposes, or that a Rush employee may disclose Plaintiff's medical record to third parties without express written authorization to receive it.

47. At all relevant times, Rush owed Plaintiff a duty to implement policies and procedures that would prevent or prohibit Rush employees from accessing patient medical records for inappropriate or tortious purposes, or otherwise without authorization. This includes a duty to educate, train and supervise employees about their obligations under HIPAA and other state privacy laws to keep patient Protected Health Information confidential.

48. At all relevant times, Rush also owed Plaintiff a duty to implement policies and procedures to timely identify instances of inappropriate or unauthorized access to a Plaintiff's Protected Health Information, and to timely notify Plaintiff of any unauthorized access or disclosure.

49. Additionally, at all relevant times, Rush owed Plaintiff a duty to implement policies and procedures to thoroughly investigate instances of inappropriate or unauthorized access to Plaintiff's Protected Health Information, including instances in which such inappropriate or unauthorized access led to the disclosure of the Protected Health Information to third parties not authorized to receive it.

50. In December 2025, in an effort to understand how McKenna came to possess any knowledge of Plaintiff's hospitalization at Rush, Plaintiff submitted a written request to Rush to provide her with an accounting of any of her Protected Health Information that had been shared with others.

51. On December 22, 2025, Rush's Privacy Office responded to Plaintiff's request and stated that Rush had "identified one instance of inappropriate access to [Plaintiff's] electronic patient record." *See* **Exhibit 1.**

52. Rush went on to state that the information that was accessible was Plaintiff's personal demographics, as well as Plaintiff's clinical information. *Id.* This information would have included the fact that Plaintiff lost her unborn child and that cocaine had been found in her system at the time of the loss.

53. In short, Rush admitted in its December 22, 2025 written response to Plaintiff that an individual improperly accessed Plaintiff's Protected Health Information.

54. Rush further indicated in its December 2025 letter that the unauthorized access to Plaintiff's medical record had been "referred to HR for follow-up action with the employee" and recommended that Plaintiff monitor her credit report. *Id.*

55. Critically, Rush did not identify in its December 2025 letter what the nature of the "inappropriate access" to Plaintiff's medical record meant. Nor did the letter identify the employee or state why they accessed Plaintiff's medical record, when they accessed Plaintiff's medical record, what they did with the information obtained, whether they shared any information gleaned from their "inappropriate access" with other third-parties, or why Plaintiff should monitor her credit report as a result of the disclosure.

56. Rush also did not identify in its December 2025 letter when it became aware that Plaintiff's Protected Health Information had been inappropriately accessed.

57. On June 24, 2026, Plaintiff responded to Rush's December 2025 letter and requested additional information. Specifically, Plaintiff requested the job title and department of the employee who accessed her record, whether the employee had a legitimate reason to access

her record, whether any of her medical information was disclosed to a third-party and whether any records were printed, downloaded, copied or otherwise shared. *See* **Exhibit 2.**

58. Rush responded on July 1, 2026 and provided little additional information. *See* **Exhibit 3.** Rush stated only that "appropriate action was taken in response to the issue," but would not provide any additional information about the individual who improperly accessed Plaintiff's medical record. Rush stated that there was "no finding that the information viewed was disclosed to any third party." *Id.*

59. This statement is false. Plaintiff has obtained text messages showing that at least one individual—Ashlee Smith-Koehler, a registered nurse—obtained detailed information about Plaintiff's diagnosis at Rush, including the fact that Plaintiff was diagnosed with eclampsia or preeclampsia. *See* **Exhibit 4.** On the same day Plaintiff was hospitalized at Rush, Smith-Koehler sent text messages to McKenna stating that Plaintiff had been hospitalized with eclampsia.

60. Upon information and belief, Smith-Koehler was either employed by Rush at the time she revealed the information to Plaintiff, or she received the information from an individual employed by Rush. Smith-Koehler was not a member of Plaintiff's care team while Plaintiff was hospitalized at Rush and could not have obtained Plaintiff's Protected Health Information unless Rush granted her access to it.

61. Rush failed to deploy, implement and enforce adequate policies and procedures for prohibiting individuals like Smith-Koehler or others from inappropriately accessing Plaintiff's medical record, as Rush has admitted that at least one of its employees did.

62. Rush also failed to deploy, implement and enforce policies and procedures that would allow Rush to timely identify inappropriate or unauthorized access to a patient's medical record. Rush did not notify Plaintiff that there had been any inappropriate access to her medical

record until nearly three months after the fact, and only after Plaintiff first notified Rush of her suspicion about the unauthorized disclosure of her Protected Health Information.

63. Nor did Rush, upon information and belief, take any action to investigate the inappropriate access or disclosure until approximately three months later, after the damage was done to Plaintiff. Rush's investigation was inadequate, as demonstrated by Rush's conclusion that its investigation did not reveal that any of Plaintiff's Protected Health Information was disclosed to third parties. Text messages reveal that at least one instance of inappropriate access and disclosure happened on the very first day of Plaintiff's hospitalization in September 2025. This fact would have been and should have been discoverable to Rush in December 2025 and July 2026, when Rush corresponded with Plaintiff about the alleged inappropriate access to Plaintiff's medical record. However, Rush's failure to identify the inappropriate disclosure highlights the inadequacy of Rush's investigation.

64. On September 22, 2025, McKenna forwarded Smith-Koehler's text message to at least one other individual.

65. Upon information and belief, Smith-Koehler sent additional text messages or communications to McKenna revealing additional details about Plaintiff's Protected Health Information, including the fact that Plaintiff's blood tested positive for cocaine and that Plaintiff lost her unborn child.

66. McKenna then repeated false statements about Plaintiff to members of Plaintiff's community, claiming that Plaintiff's use of cocaine caused her to lose her unborn child, to destroy Plaintiff's reputation and to cause Plaintiff emotional distress. Unfortunately, McKenna succeeded.

67. Upon information and belief, McKenna knew—when receiving and reciting details about Plaintiff's Protected Health Information—that he was not authorized to receive Plaintiff's Protected Health Information from Rush or any of its employees or agents.

68. Rush has refused to identify the employee that had "inappropriate" access to Plaintiff's Protected Health Information. It is therefore still unknown which Rush employees or agents were permitted to gain unauthorized access to Plaintiff's medical record and contributed to the life-altering fallout Plaintiff has suffered as a direct result of the improper access to and disclosure of her Protected Health Information.

69. Plaintiff's life has been completely upended by Rush's and McKenna's acts and omissions. McKenna has permanently damaged Plaintiff's reputation and standing in her community by spreading the false rumor that Plaintiff killed her unborn child. Plaintiff was forced to fight misguided claims brought by DCFS, which led to her being publicly and privately labeled a "baby killer" and led to lasting reputational damage in her community. Plaintiff lost almost nine months of regular access to her children, and her relationship with her oldest child has deteriorated because of the DCFS investigation and related rumors. Plaintiff also incurred extensive attorneys' fees as a result of the DCFS investigation. But the monetary damages pale in comparison to the lasting emotional distress, shame, embarrassment, humiliation and anguish Plaintiff feels and has felt nearly every day as a direct and proximate result of the disclosure of her Protected Health Information by individuals with no authorization to possess it.

## COUNT I: NEGLIGENCE
**(Rush)**

70. Plaintiff restates and re-alleges Paragraphs 1 through 69 as if fully set forth herein.

71. Rush owed to Plaintiff a duty to exercise reasonable care in storing, handling and using Plaintiff's Protected Health Information, including implementing privacy and access

procedures sufficient to reasonably protect the information from unauthorized access, disclosure and use.

72. Rush owed Plaintiff a duty of care to implement policies and procedures to timely identify and notify Plaintiff about the inappropriate or unauthorized access to, use or disclosure of her Protected Health Information.

73. Rush owed Plaintiff a duty of care to educate, train and monitor its employees regarding their access to and use of Plaintiff's Protected Health Information, including employees' obligations under state and federal law to keep Plaintiff's Protected Health Information strictly confidential.

74. At all relevant times herein, Plaintiff's Protected Health Information was in the exclusive possession and control of Rush, Plaintiff and Plaintiff's sisters, the only individuals authorized to receive the Protected Health Information.

75. Additional individuals, including but not limited to Smith-Koehler and Mr. McKenna, nevertheless obtained unauthorized access to Plaintiff's Protected Health Information and disclosed and used that information.

76. Rush breached its duty of care by failing to implement adequate privacy and access procedures to protect Plaintiff's Protected Health Information from unauthorized access, disclosure and use.

77. Rush further breached its duties by failing to exercise reasonable care in supervising its employees and agents in the handling, access, use and disclosure of Plaintiff's Protected Health Information.

78. Rush breached its duty of care by disclosing Plaintiff's Protected Health Information to third parties without Plaintiff's written authorization and consent.

79. Rush also breached its duty of care by inadequately investigating the unauthorized disclosure of or access to Plaintiff's Protected Health Information. Rush told Plaintiff in its July 1, 2026 correspondence to Plaintiff that there was "no finding that the information viewed was disclosed to any third party," which is demonstrably false. At least one individual, Ashlee Smith-Koehler, disclosed Plaintiff's Protected Health Information to McKenna, and Smith-Koehler either obtained that information while working at Rush or from a yet-unknown Rush employee.

80. Plaintiff's Protected Health Information is highly sensitive and Rush knew, or should have known, that emotional, reputational and financial harm that would be inflicted upon Plaintiff by the unauthorized access, disclosure and use of her Protected Health Information. Such harm was reasonably foreseeable given the sensitivity of the Protected Health Information pertaining to Plaintiff's September 22, 2025 hospital visit.

81. As a direct and proximate result of Rush's negligence, Plaintiff has suffered significant harm. Specifically, Plaintiff has suffered severe and lasting emotional distress, reputational damage, embarrassment and humiliation as a result of her Protected Health Information being shared by Rush's employees, her ex-husband, DCFS and other yet-unknown individuals.

82. Rush's acts and omissions were willful, wanton and conducted with a complete disregard for Plaintiff's rights, entitling Plaintiff to punitive damages.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter a judgment in her favor and against Rush and award Plaintiff compensatory damages, punitive damages and any other relief as shall be just and proper under the circumstances.

**COUNT II: NEGLIGENCE PER SE**
**(Rush)**

83. Plaintiff re-states and re-alleges Paragraphs 1 through 69 as if fully set forth herein.

84. Plaintiff brings this negligence *per se* count in the alternative to her common law negligence claim.

85. As alleged herein, HIPAA, the HIPAA privacy rules (45 C.F.R. §§ 160, 164), the Illinois MPRA and the IPIPA impose a duty and obligations on Rush to (i) implement and maintain reasonable security measures to protect the unauthorized disclosure of records containing the personal information of an Illinois resident and (ii) refrain from using, disclosing or allowing unauthorized access to a patient's Protected Health Information.

86. Plaintiff is an Illinois resident and was a patient seeking health care services at Rush on September 22, 2025.

87. Rush is a health care provider within the meaning of HIPAA and the MPRA, is a data collector within the meaning of the IPIPA, and is a hospital within the meaning of the HLA.

88. Rush breached its duty of care under HIPAA, the MPRA, the HLA and the IPIPA by failing to implement adequate privacy and access procedures to protect Plaintiff's Protected Health Information from unauthorized access, disclosure and use.

89. Rush further breached its duty of care under HIPAA, the MPRA, the HLA and the IPIPA by failing to exercise reasonable care in supervising its employees and agents in the handling, access, use and disclosure of Plaintiff's Protected Health Information.

90. Rush breached its duty of care under HIPAA, the MPRA, the HLA and the IPIPA by disclosing Plaintiff's Protected Health Information to third parties without Plaintiff's written authorization and consent.

91. Plaintiff's Protected Health Information is highly sensitive and Rush knew, or should have known, that emotional, reputational and financial harm that would be inflicted upon Plaintiff by the unauthorized access, disclosure and use of her Protected Health Information. Such

harm was reasonably foreseeable given the sensitivity of the Protected Health Information pertaining to Plaintiff's September 22, 2025 hospital visit.

92. Rush's acts and omissions were willful, wanton and conducted with a complete disregard for Plaintiff's rights, entitling Plaintiff to punitive damages.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter a judgment in her favor and against Rush and award Plaintiff compensatory damages, punitive damages and any other relief as shall be just and proper under the circumstances.

**COUNT III: VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT OF 1986 ("Wiretap Act"), 18 U.S.C. § 2510 *et seq.***
**(Rush, McKenna)**

93. Plaintiff restates and re-alleges Paragraphs 1 through 69 as if fully set forth herein.

94. An "electronic communication," within the meaning of the Wiretap Act, means the "transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce."

95. A "wire communication," within the meaning of the Wiretap Act, is any "aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception . . . furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce."

96. The Wiretap Act prohibits the intentional interception, use, disclosure or procurement of wire, oral or electronic communications.

97. Rush employees and agents who were members of Plaintiff's care team during her hospitalization at Rush on September 22, 2025, used electronic and wire communications to author, prepare and contribute to Plaintiff's electronic medical record.

98. On or around September 22, 2025, Rush improperly and intentionally disclosed to at least one other unauthorized individual, through electronic and wire communications, Plaintiff's electronic medical record and Protected Health Information.

99. Rush has admitted that at least one individual had unauthorized access to Plaintiff's Protected Health Information. That individual intercepted a wire or electronic communication within the meaning of the Wiretap Act.

100. Upon information and belief, Smith-Koehler was either the intercepting Rush employee or an individual to whom the Rush employee provided Plaintiff's Protected Health Information.

101. The intercepting Rush employee and/or Smith-Koehler intercepted Plaintiff's Protected Health Information for the purpose of transmitting it to McKenna in violation of HIPAA and the other Illinois statutory and common law tort claims alleged herein.

102. On or around September 22, 2025, Smith-Koehler intentionally disclosed the contents of Plaintiff's Rush medical record to McKenna electronically through text messages.

103. On or around September 22, 2025 and afterward, McKenna intentionally disclosed to other individuals the contents of wire or electronic communications pertaining to Plaintiff's Protected Health Information that Smith-Koehler had provided to him.

104. Specifically, McKenna disclosed the contents of the wire or electronic communications pertaining to Plaintiff's Rush medical record to Plaintiff's ex-boyfriend, to a contractor performing work on Plaintiff's house, and to other members of Plaintiff's community.

105. Upon information and belief, either McKenna, Rush or both further disclosed Plaintiff's Protected Health Information to DCFS, despite having no authorization or authority to do so and in violation of the Wiretap Act.

106. Plaintiff suffered significant emotional, reputational and financial harm as a result of the public disclosure of her private Protected Health Information, as described herein.

107. Rush and McKenna's acts of intercepting, disclosing and using Plaintiff's electronic medical record and Protected Health Information were done without authorization and for the purpose of invading Plaintiff's privacy, intentionally harming Plaintiff and defaming Plaintiff, as further described herein, authorizing the imposition of penalties outlined in the Wiretap Act.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter a judgment in her favor and against Defendants and award Plaintiff statutory damages, compensatory damages, punitive damages and any other relief as shall be just and proper under the circumstances.

**COUNT IV: EAVESDROPPING IN VIOLATION OF 720 ILCS 5/14 *et seq.***
**(Rush, McKenna)**

108. Plaintiff restates and re-alleges Paragraphs 1 through 69 as if fully set forth herein.

109. A "private conversation," within the meaning of 720 ILCS 5/14-1, is any "oral communication between 2 or more persons, whether in person or transmitted between the parties by wire or other means, when one or more of the parties intended the communication to be of a private nature under circumstances reasonably justifying that expectation."

110. A "private electronic communication," within the meaning of 720 ILCS 5/14-1, is any "transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer . . . when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation."

111. On or around September 22, 2025, a Rush employee intentionally and scrumptiously intercepted or endeavored to intercept a private electronic conversation or private conversation to which she was not a party for the purpose of disclosing it to McKenna or others.

112. Upon information and belief, Smith-Koehler was either the intercepting Rush employee or an individual to whom the Rush employee provided Plaintiff's Protected Health Information.

113. On or around September 22, 2025, Smith-Koehler intentionally disclosed the contents of Plaintiff's Rush medical record to McKenna electronically through text messages.

114. Neither the Rush employee nor Smith-Koehler had the consent of all parties—namely, Plaintiff—before disclosing Plaintiff's medical record to McKenna.

115. On or around September 22, 2025 and afterward, McKenna intentionally disclosed to other individuals the contents of a private conversation or private electronic communication pertaining to Plaintiff's Rush medical record that Smith-Koehler had provided to him.

116. Specifically, McKenna disclosed the contents of the wire or electronic communications pertaining to Plaintiff's Rush medical record to Plaintiff's ex-boyfriend, to a contractor performing work on Plaintiff's house, and to other members of Plaintiff's community.

117. McKenna did not have the consent of all parties—namely, Plaintiff—before disclosing Plaintiff's medical record to others in Plaintiff's community. Additionally, McKenna knew or reasonably should have known that he was not authorized to receive Plaintiff's medical record, and he should have therefore known the record was obtained from a private conversation or private electronic communication.

118. Rush has admitted that a Rush employee improperly accessed Plaintiff's medical records and Protected Health Information. Smith-Koehler was also not authorized to access or disclose Plaintiff's medical records to McKenna.

119. Plaintiff suffered significant emotional, reputational and financial harm as a result of the public disclosure of her private Protected Health Information, as described herein.

120. Rush and McKenna's acts and omissions were willful, wanton and conducted with a complete disregard for Plaintiff's rights, entitling Plaintiff to punitive damages.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter a judgment in her favor and against Defendants and award Plaintiff statutory damages, compensatory damages, punitive damages and any other relief as shall be just and proper under the circumstances.

**COUNT V: PUBLICATION OF PRIVATE FACTS**
**(All Defendants)**

121. Plaintiff restates and re-alleges Paragraphs 1 through 69 as if fully set forth herein.

122. Plaintiff's Protected Health Information consists of private facts about Plaintiff and her health.

123. Plaintiff's Protected Health Information is not public information.

124. Rush has admitted that it disclosed Plaintiff's non-public Protected Health Information to at least one employee or agent who was not entitled to receive it. That Rush employee either was Smith-Koehler or transmitted the Protected Health Information to Smith-Koehler.

125. Smith-Koehler sent text messages to Plaintiff's ex-husband, McKenna, disclosing Plaintiff's non-public Protected Health Information.

126. McKenna is a member of the general public and has a "special relationship" to the Plaintiff because of his previous status as Plaintiff's husband. Accordingly, McKenna had

knowledge of and access to members of Plaintiff's social circle, and disclosing private facts about Plaintiff to McKenna would be particularly embarrassing, humiliating and damaging for Plaintiff.

127. McKenna disclosed Plaintiff's non-public Protected Health Information to members of Plaintiff's community, including the contractor who worked on Plaintiff's home and others.

128. The public disclosure of Plaintiff's Protected Health Information would be highly offensive to a reasonable person. Among other things, Plaintiff's Protected Health Information includes the fact that Plaintiff lost her unborn child and had cocaine in her system at the time of the loss. Such information is therefore particularly damaging to a woman and mother when disclosed to members of her community or the general public.

129. In fact, Plaintiff suffered significant emotional, reputational and financial harm as a result of the public disclosure of her private Protected Health Information, as described herein.

130. Defendants' acts and omissions were willful, wanton and conducted with a complete disregard for Plaintiff's rights, entitling Plaintiff to punitive damages.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter a judgment in her favor and against Defendants and award Plaintiff compensatory damages, punitive damages and any other relief as shall be just and proper under the circumstances.

## COUNT VI: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(All Defendants)**

131. Plaintiff restates and re-alleges Paragraphs 1 through 69 as if fully set forth herein.

132. Rush has admitted that one of its employees had inappropriate or unauthorized access to Plaintiff's medical record and Protected Health Information.

133. At least one Rush employee knowingly and intentionally disclosed Plaintiff's Protected Health Information to McKenna or another individual who was not authorized to receive it.

134. McKenna knowingly and intentionally disclosed Plaintiff's Protected Health Information to members of Plaintiff's community.

135. Plaintiff's Protected Health Information contains particularly sensitive information. Specifically, Plaintiff's Protected Health Information consists, among other things, of information pertaining to the loss of Plaintiff's unborn daughter and the presence of drugs in Plaintiff's blood at the time of the loss.

136. The particular sensitivity of Plaintiff's Protected Health Information would lead any reasonable person to believe that the unauthorized disclosure, use or dissemination of such information would lead to significant reputational harm and emotional distress to Plaintiff.

137. Rush's and McKenna's unauthorized disclosure of Plaintiff's Protected Health Information, including information pertaining to the miscarriage of Plaintiff's unborn daughter and the presence of drugs in Plaintiff's blood around the time of the miscarriage, is extreme and outrageous behavior.

138. Rush's and McKenna's unauthorized disclosure of Plaintiff's Protected Health Information has directly and proximately caused Plaintiff extreme emotional distress and mental anguish.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter a judgment in her favor and against Defendants and award Plaintiff compensatory damages, punitive damages and any other relief as shall be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 25, 2026

Respectfully submitted,

ELIZABETH MCKENNA

*By: Katie A. O'Neill*________
*One of her attorneys*

Katie A. O'Neill
**O'NEILL LAW LLC**
125 S. Clark St., Ste. 1700
Chicago, IL 60603
(312) 242-2002
katie@olawlit.com